| | |
|---|---|
| **UNITED STATES** | **CRIMINAL ACTION** |
| **VERSUS** | **NO. 12-141** |
| **MYRON SAUNDERS, et. al.** | **SECTION: "G"(3)** |

## ORDER AND REASONS

Before the Court is Defendant Myron Saunders' ("Defendant" or "Saunders") Motion to Suppress Identification,[1] wherein he moves the Court to suppress the photographic identification by Bank Teller A[2] and prohibit any in-court identification by Bank Teller A at trial. Having considered the arguments and testimony presented at the hearing, the motion, the memorandum in support, the opposition, the supplemental briefs, the record, and the applicable law, the Court finds that the procedures used by the Jefferson Parish Sheriff's Office ("JPSO") of issuing a press release of the defendant's arrest for bank robbery along with his photograph prior to conducting the photographic lineup with the witness; and the photographic array and procedures for conducting the photographic lineup used in this case, unnecessary and impermissibly suggestive; however, considering the totality of the circumstances in this particular case, the Court finds the identification reliable, and so, for the following reasons, the Court declines to suppress the photographic identification of Bank Teller A and will not prohibit any in-court identification by Bank Teller A.

---

[1] Rec. Doc. 67.

[2] The witness was initially identified as Bank Teller A, because the teller's identity was blacked out in the discovery documents. However, on March 26, 2012, this matter was unsealed and Bank Teller A was identified at the hearing on April 19, 2013 as Rhiannon Aswad.

# I.  Background

## A.  *Procedural Background*

On March 23, 2012, the Government filed a 6-Count Indictment[3] charging defendants, Lamar

Nero ("Nero") and Saunders, with conspiracy to commit bank robbery in violation of 18 U.S.C. § 371;

armed bank robbery on June 24, 2011 in violation of 18 U.S.C.  §§ 2113(a) and (d) and (2); use of a

firearm in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2; and three

counts of attempted bank robbery on November 5, 2011, December 10, 2011, and December 24, 2011,

in violation if Title 18 U.S.C. §§ 2113(a) and (2).

On February 22, 2013, Saunders filed a Motion to Suppress Identification,[4] wherein he requests

that the photographic lineup identification of Bank Teller A and any in-court identification by her be

suppressed because the lineup was unnecessarily suggestive.  The Government opposed the motion

on March 5, 2013.[5]  The Court heard oral argument on April 19, 2013, wherein the testimony of JPSO

Detective, Wayne Rumore ("Det. Rumore"), JPSO Sergeant, Frank Renaudin ("Sgt. Renaudin"), and

Bank Teller A were presented.[6]  The Court permitted post-hearing briefs, and on May 3, 2013, the

Government and Defendant filed supplemental briefings.[7]

---

[3] Rec. Doc. 8.

[4] Rec. Doc. 67.

[5] Rec. Doc. 82.

[6] Transcript of Oral Argument (hereinafter "Transcript"), Rec. Doc. 93.

[7] Defendant's Supplemental Brief, Rec. Doc. 94; Government's Supplemental Brief, Rec. Doc. 95.

### B. Factual Background

On November 5, 2011, at approximately 8:30 a.m., Bank Teller A arrived and entered the Fidelity Homestead Bank in Metairie, Louisiana. After Bank Teller A had already entered the bank, and Bank Teller B had approached the door to enter, Robber 1approached Bank Teller B with his face uncovered and wearing a hooded sweatshirt. Robber 1 and Bank Teller B waited at the door for Bank Teller A to open it, so they could enter. According to the statement Bank Teller A provided on the day of the bank robbery, Bank Teller A "heard someone yelling 'open the door.' [Bank Teller A] pressed the silent alarm in the bank then opened the door."[8] However, the video presented by the Government in the suppression hearing indicates that Bank Teller A opened the door and then reached over to press the silent alarm. The statement Bank Teller A provided on the day of the robbery notes that after Robber 1 entered the bank, Robbers 2 and 3 then entered the bank wearing baseball caps and bandanas over their faces.[9] Bank Teller A stated that Robber 1 instructed the tellers to open the vault and remove the money. According to Bank Teller A, Robber 1 then instructed the tellers to kneel in the corner, and all three robbers fled the bank with $59,350.00 in cash from the safe.[10]

On November 5, 2011, when Bank Teller A provided a statement to Task Force Officer Jeff Rodrigue and Det. Rumore, of the JPSO, she described Robber 1 as a "black male, late twenties to early thirties, approximately 6' tall, heavy build, having acne on face and wearing a grey hooded sweatshirt with the hood over his head."[11] Det. Rumore testified that Saunders was not a suspect at

---

[8] Rec. Doc. 67-4 at p. 1.

[9] *Id.*

[10] *See* Rec. Doc. 82 at p. 2; Rec. Doc. 67-4 at p. 1.

[11] Rec. Doc. 67-4 at p. 1.

the time Bank Teller A's statement was taken.[12]

The police had DNA evidence from another bank robbery, which led them to Nero, Saunders' co-defendant in this matter. According to Det. Rumore, on January 11, 2012, Nero's girlfriend recognized Saunders from a photograph the police showed her and indicated that Saunders had picked her and Nero up in a white van.[13] (In the video shown in Court of the robbery at the Metairie bank at issue, the robbers used a white van to commit the crime). Although Nero's girlfriend did not indicate that Saunders was involved in the bank robbery, she gave the police Saunders' name and the location of his residence.[14] Det. Rumore testified that on that same day, Saunders was arrested,[15] and the JPSO prepared and issued a press release announcing Saunders' arrest and included his photograph.[16] According to Det. Rumore, the JPSO's diffusion machine was inoperable, and so, he submitted Saunders' photograph and a physical description to the Louisiana State Police, requesting that two photographic arrays be prepared.[17]

On January 12, 2012, Det. Rumore received two photographic arrays from the Louisiana State Police, one of which was used in the photographic lineup presented to Bank Teller A, and the other was used in the photographic lineup presented to Bank Teller B.[18] Further, Det. Rumore testified that

---

[12] Rec. Doc. 95 at p. 2 (citing Transcript, Rec. Doc. 93 at p. 26).

[13] *Id.*

[14] Transcript, Rec. Doc. 93 at pp. 46-48.

[15] *Id.* at p. 27. Although Det. Rumore testified that Saunders was arrested on January 11, 2012, defense counsel stated at oral argument and the NOLA.com article confirms that Saunders was arrested early in the morning on January 12, 2012. *See* Transcript, Rec. Doc. 93 at p. 18; Rec. Doc. 67-7 (NOLA.com article noting that the arrests occurred on Wednesday, the day before the article was published ).

[16] Transcript, Rec. Doc. 93 at p. 51.

[17] Rec. Doc. 95 at pp. 2-3 (citing Transcript, Rec. Doc. 93 at p. 27).

[18] *Id.* at p. 3.

he tried to meet Bank Teller A on January 12, 2013 to show her the lineup, but they were "unable to meet up" because of "a scheduling conflict."[19] He later could not recall the nature of that conflict or why he did not have another officer take the photographic array to Bank Teller A immediately.[20] On the same day at approximately 1:30 p.m., NOLA.com published an article concerning the arrests of Saunders and his co-defendant, Nero, as the suspected bank robbers in the Metairie bank heist, which included photographs of the suspects.[21]

Regarding the publication of Defendant's picture in the paper, Det. Rumore testified during the suppression hearing in response to questioning from defense counsel:

> Q. But you knew because you, in fact, told her you knew there was potentially going to be posted in the newspaper a picture of my client following his arrest. You were aware of that?
> A. Yes.
> Q. And with that knowledge you still chose not to immediately go take this photo lineup to [Bank Teller A] for identification?
> A. I didn't chose it, just wasn't, we weren't able to do that at that time. I would have definitely did it if it was available.
> Q. Well, you had in your duties, Detective, to take it eventually, correct?
> A. Take -- I'm sorry?
> Q. The photo lineup to [Bank Teller A]?
> A. Yes, sir.
> Q. Detective Renaudin did it?
> A. Yes.
> Q. Why didn't you have the detective do it immediately when you received it?
> A. Most likely, like I said, I cannot recall. [Bank Teller A] might have been the one that wasn't available at the time. Otherwise, we would have met him with her and shown her that day. That's why I called her and advised her.
> Q. What exactly was the conversation you had with her?
> A. Just, I just instructed her not to look at any news or anything like that, because we were going to show a photograph or photographs at our next available time, which was the next day and meet up with her, and she was available the next day.
> Q. And did you explain to her why not look at the news or not to look at any other

---

[19] Transcript, Rec. Doc. 93 at p. 28.

[20] *See id.* at pp. 49-50.

[21] Rec. Doc. 67-7 at p. 1; *see also* Transcript, Rec. Doc. 93 at p. 18.

news?

A. I just told her that we were going to show some photographs, and I didn't want her to look at the news. I didn't say anything about any suspect or anything like that.

Q. Did you say what photographs you would be showing her?

A. I just said generally, just photographs. I usually just say I have to show you some photographs. I have to show a lineup.[22]

According to Det. Rumore, it was the policy of the JPSO, upon arrest, to issue a press release containing a photograph:

Q. Does Jefferson Parish issue press releases when they make arrests?

A. Yes.

Q. And in connection with those press releases, do they issue photographs?

A. Yes.

Q. So the reason that photographs are in that NOLA dot com (nola.com) article is because Jefferson Parish made an arrest and issued my client's photograph in connection with that arrest, isn't that correct?

A. Yes.[23]

When asked why Det. Rumore told Bank Teller A not to look at the news, he explained:

A. I didn't want her, I didn't want the photographs -- I knew that the photographs were going to be in the paper by the time we were available to show her the lineup. I didn't want her to look at that and then somehow that had any kind of –

Q. *You knew it was prejudicial to the police if she saw it?*

A. *Yes.*[24]

On January 13, 2013, Sgt. Renaudin showed a photographic lineup to Bank Teller A. Only after she affirmatively identified Saunders' photograph did Sgt. Renaudin take what he refers to as an audio statement from Bank Teller A at 10:53 a.m.[25] Sgt. Renaudin testified that he had two copies of the photographic array, and one copy had the "name and identification numbers in case we have to

---

[22] Transcript, Rec. Doc. 93 at pp. 49-50.

[23] *Id.* at pp. 50-51.

[24] *Id.* at p. 51 (emphasis added).

[25] Rec. Doc. 67-6. Bank Teller B did not make any identification from the lineup presented to her, which also contained Saunders' photograph.

recreate the lineup for any reason."[26]  He stated, "[s]o, I mean, obviously I know who Mr. Saunders

was, because his name was on the lineup underneath the picture."[27]  Regarding his presentation of the

lineup to Bank Teller A, Sgt. Renaudin testified:

> Q. . . . The first time you spoke with [Bank Teller A] was on January 13, 2012, when you showed her the lineup?
> A. Yes, sir, never met her before, never met her a day in my life.
> Q. We have a transcript. We have a transcript of that conversation you had with [Bank Teller A]. Did you have any conversation with her before you had hit the record on the audio player?
> A. Yes, sir.
> Q. Can you tell us about that conversation?
> A. That's when I presented the lineup to her. I mean, obviously, knocked on the door and introduced myself. I told her that I was the investigator with the Sheriff's Office. I showed her my ID, you know, said where would you like to do this at? I think there was a nearby area that she was -- it was a drive-through bank. So there were obviously customers, so we don't be too long.
> So I just let her know who I was, showed her my credentials, went over with her did she look at the news, all of the things that I testified to before this point.
> Q. Did you show her the lineup before you hit the record on the tape player?
> A. Yes, sir.
> Q. And when did you decide to hit record on the tape player?
> A. After I signed the lineup documenting her positive identification. It is not a practice of ours if they do not make an identification to take a tape recorded statement. If they do positively recognize anyone, we just document that in a supplemental report that the person being presented the lineup, that they didn't recognize anybody.[28]

According to the transcript of Bank Teller A's unsworn statement taken after the photographic

identification, Sgt. Renaudin inquired as to whether Bank Teller A was "contacted by Detective Wayne

Rumore with the Jefferson Parish Sheriff's Office" the day before, and whether Det. Rumore had given

her any instructions.[29]  Although not under oath at the time, Bank Teller A told Sgt. Renaudin during

her unsworn statement (taken after she first made a positive identification of Saunders in the

---

[26] Transcript, Rec. Doc. 93 at p. 60.

[27] *Id.*

[28] *Id.* at pp. 63-64.

[29] Rec. Doc. 67-6 at p. 4.

photographic lineup) that Det. Rumore had contacted her to say "that a detective would be coming today to show [her] a photo lineup and not to look at the news or any such form."[30] When asked: "Did you look at the internet? Did you look at the news? Did you see any kind of pictures or uh, any, read any articles or listen to any articles in reference to an investigation that was ongoing?" Bank Teller A responded: "No, I did not."[31]  At the suppression hearing, Bank Teller A testified to the following regarding whether she saw the NOLA.com article identifying Saunders prior to the photographic lineup:

> Q: Let me ask you again, if you had, do you have a computer at your home?
> A. Yes.
> Q. Do you have Internet access?
> A. Yes.
> Q. Have you been on NOLA dot com (nola.com)?
> A. Yes.
> Q. You didn't look at NOLA dot com (nola.com) at all?
> A. No.
> Q. Get on the Internet between when you spoke with Detective Rumore and the next morning when Detective Renaudin came to talk to you?
> A. No.
> Q. You didn't get on the Internet at all during this time period?
> A. I don't remember.
> Q. Do you remember when Detective Rumore came, actually called you?
> A. Yes.
> Q. When was it?
> A. The day before.
> Q. What time of day?
> A. I don't remember.
> Q. Morning?
> A. I don't remember.
> Q. You don't remember at all?
> A. No.[32]

Bank Teller A identified Saunders in a photographic lineup that contained four men in black

---

[30] *Id.*

[31] *Id.*

[32] Transcript, Rec. Doc. 93 at pp. 96-97.

shirts and two men, one of whom was Saunders, in white shirts.  When Sgt. Renaudin asked Bank

Teller A why she had identified number 5, Saunders' photograph, she responded: "Um, he looks like

the guy that came and robbed us. . . . Uh, because of his facial features really."[33]  Sgt. Renaudin then

asked: "Okay, does he look like him or would you say that, that is the man?"[34]  Bank Teller A

confirmed "Yes, I would say that, that is him. . . Yes, definitely."[35]  Sgt. Renaudin testified that Bank

Teller A was "a hundred percent" and that she said "it's him" during the photographic lineup.[36]  Later,

at the suppression hearing, Bank Teller A testified that she was "[n]inety-five [percent] sure, very sure"

of her selection.[37]  It is not clear what level of certainty Bank Teller A had at the time of her initial

identification, because her initial identification was not recorded, and Sgt. Renaudin only recorded her

statement after she made an affirmative identification of Saunders, which Sgt. Renaudin testified was

the practice of the JPSO.

## II.  Parties' Arguments

### A.  *Defendant's Motion to Suppress*

Saunders moves for suppression of the photographic lineup identification, claiming that it was

unnecessary and prejudicial to Defendant for the JPSO to issue a press release regarding his arrest with

a photograph before conducting a photographic lineup with the witness, and because the photographic

lineup itself was unnecessarily suggestive, all in violation of the Due Process Clause of the Fifth

---

[33] Rec. Doc. 67-6 at p. 5.

[34] *Id.*

[35] *Id.*

[36] Transcript, Rec. Doc. 93 at p. 65.

[37] *Id.* at 81.

Amendment.[38]

Defendant notes that "Bank Teller A gave a limited description of the perpetrators of the bank robbery in her initial statement," and then two months passed between the robbery and the request for a photographic lineup, which was made after the JPSO arrested Saunders, and his photograph was published in an article on NOLA.com.[39]  Although Bank Teller A was instructed on January 12, 2011 not to look at the news or read any newspapers, Defendant argues that "it is unclear whether [Bank Teller A] heeded the Detective's instructions and in fact did not see the article containing the photographs and listing Defendant as the suspect."[40]  Moreover, Defendant rhetorically asks: "[W]hat is the purpose of releasing this photo prior to showing a witness a photographic lineup?"[41]

Defendant argues that the "suggestiveness is clear" when the witness identifies an alleged perpetrator from newspaper photographs alone.[42]  Here, Defendant claims that the "close proximity in time between the newspaper article and the identification by Bank Teller A calls into question the whole identification process."[43]  Further, Defendant notes that the United States Supreme Court has stated that "the evolution over time of a given eyewitnesses description can be fatal to its reliability,"[44] and here, Defendant avers that the "two-month time period between the bank robbery and the []

---

[38] Rec. Doc. 67-1 at p. 2 (citing *Kirby v. Illinois*, 406 U.S. 682, 691 (1972)).

[39] *Id.* at p. 3.

[40] *Id.*

[41] Rec. Doc. 94 at p. 2.

[42] Rec. Doc. 67-1 at p. 3.

[43] *Id.* at p. 4.

[44] *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 444 (1995)).

identification is fatal to the identification."[45] Accordingly, Defendant contends that because Bank Teller A has no independent basis for an in-court identification other than her tainted pretrial identification, she should be prohibited from making an identification at trial.[46]

## B. *Government's Opposition*

In opposition to the motion to suppress, the Government argues that the Court need not even consider the reliability of the identification to determine whether there was a substantial likelihood of irreparable misidentification, because Saunders has not met his burden to establish that: (1) there was any improper police influence; (2) that the evidence is unfairly prejudicial; and (3) that "the photographic array or the procedure utilized was suggestive."[47] The Government states that the detectives instructed Bank Teller A not to look at any news accounts, and the photographic array contained five other individuals who were similar in appearance to Saunders. Furthermore, even if Defendant establishes that the identification procedure was unduly suggestive, the Government contends that Defendant has failed to demonstrate a substantial likelihood of misidentification based on the following five factors that a court should consider: "(1) the opportunity of the witness to view the assailant at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the assailant, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation."[48]

The Government further notes that "[w]here the judge does not find as a matter of law that the

---

[45] *Id.*

[46] *Id.*

[47] Rec. Doc. 82 at p. 5.

[48] *Id.* at p. 5 (citing *United States v. Hefferon*, 314 F.3d 211, 217 (5th Cir. 2002)).

picture spread was objectionable, the defendant's only recourse is to use the circumstances of the identification procedure for cross-examination purposes in order to attack the credibility of the identifying witness."[49] According to the Government, the Defendant should only be permitted to raise his concerns regarding whether Bank Teller A followed Det. Rumore's instructions to avoid the news and the length of time between the robbery and identification on cross-examination at trial, because the Defendant has "failed to establish that the identification is defective as a matter of law."[50]

## C. Defendant's Supplemental Brief

In the supplemental brief, Saunders reiterates that the "timing of the photographic lineup was questionable in light of the Jefferson Parish Sheriff's Office decision to immediately publish a photograph of Myron Saunders in connection with his arrest prior to [Bank Teller A] being shown the photographic lineup."[51] Saunders contends that, although Bank Teller A stated that she did not visit NOLA.com prior to viewing the lineup, the identification should not be permitted if there is "even the possibility that [Bank Teller A] could have viewed Mr. Saunders prior to being shown the lineup," especially when it is the JPSO who released the photograph in connection with the arrest within hours of conducting the identification.[52] Further, Saunders notes that Det. Rumore testified that "he could not remember what 'scheduling conflict' kept him from showing the lineup to [Bank Teller A] as soon as possible."[53]

---

[49] *Id.* at p. 6 (*United States v. Smith*, 546 F.2d 1275, 1281-82 (5th Cir. 1977)).

[50] *Id.*

[51] Rec. Doc. 94 at p. 1.

[52] *Id.* at pp. 1-2.

[53] *Id.* at p. 2 (quoting Transcript, Rec. Doc. 93 at p. 49).

Saunders also contends that the photographic lineup itself was suggestive. Saunders states that Sgt. Renaudin testified that he asked Bank Teller A while conducting the lineup if "no one sticks out from the other? . . . . like does one have a red shirt and the other five have white shirts."[54] Saunders explains that only two individuals had white shirts, including Saunders, and he was in the center of the lineup. Defendant notes that Det. Rumore testified that only Saunders' photograph depicted an individual with a "thick mustache."[55]

Furthermore, Saunders argues that Bank Teller A's testimony reveals that she only viewed the suspect for a few seconds "through a one foot by one foot window with chicken wire," and once Robber 1 was in the bank, she only viewed him for one or two seconds more while she opened the door.[56] Saunders reiterates that Bank Teller A gave only a limited description after the robbery and over two months had passed between the robbery and the lineup. Saunders further explains that Bank Teller A originally stated in her identification that the photograph of Saunders in the lineup "looks like" Robber 1, but Det. Renaudin did not inquire as to why Bank Teller A initially stated that the photograph looked like, rather than was, the robber.[57] Finally, Saunders argues that Bank Teller A's identification should be compared with Bank Teller B's failure to make an identification of Saunders in the photographic array presented to her, even though she had a better view of Robber 1 than Bank Teller A.[58]

---

[54] *Id.* at pp. 2-3 (quoting Transcript, Rec. Doc. 93 at p. 66).

[55] *Id.* at p. 3 (quoting Transcript, Rec. Doc. 93 at p. 32).

[56] *Id.* (citing Transcript, Rec. Doc. 93 at pp. 89-90).

[57] *Id.* at p. 4 (quoting Transcript, Rec. Doc. 93 at p. 68).

[58] *Id.* at pp. 4-5 (citing Transcript, Rec. Doc. 93 at p. 35).

*D. Government's Supplemental Brief*

In its supplemental brief, the Government emphasizes that the burdens of production and persuasion are on the movant in a suppression hearing. The Government contends that where the movant does not carry its burden to establish the existence of improper police influence or the suggestiveness of the photographic array itself, the inquiry ends and the issues of the reliability of the information and the credibility of the identifying witness must be resolved by the jury.[59]

The Government argues that the suppression of evidence is reserved only for the most egregious of circumstances, such as where only two of the photographs resembled the defendant,[60] where only the defendant's photograph was darkly lit,[61] or where an identification was made only after the detective told the witness to look closely at the defendant's photograph.[62] According to the Government, the facts of this case bear no resemblance to the "egregious violations" of constitutional rights present in other cases where suppression was deemed appropriate.[63] The Government maintains that Saunders' argument that the photographic array was impermissibly suggestive because he was one of only two men wearing a white shirt is unavailing, because, in *United States v. Fletcher*,[64] the Fifth Circuit upheld an identification where the defendant was the only person wearing a suit and tie.[65] The

---

[59] Rec. Doc. 95 at pp. 4-5 (citing *Perry v. New Hampshire*, 132 S.Ct. 716 (2012)).

[60] *Id.* at p. 8 (citing *United States v. DeCologero*, 530 F.3d 36, 62 (1st Cir. 2008)(a photo array in which four of six photos did not resemble the defendant was impermissibly suggestive)).

[61] *Id.* (citing *Styers v. Smith*, 659 F.2d 293, 297-298 (2d Cir. 1981)(a photo array where the two suspects' photos were the only ones that were recent and in color was impermissibly suggestive)).

[62] *Id.* (citing *Thomas v. Varner*, 428 F.3d 491, 503 (3d Cir. 2005)(a photo array where the witness was unable to identify anyone until the detective told the witness to look closely at the photo of the defendant was impermissibly suggestive)).

[63] *Id.* at pp. 8-9.

[64] 121 F.3d 187 (5th Cir. 1997).

[65] *Id.* at 194-95.

Government also avers that the Fifth Circuit upheld an identification in *Swicegood v. Alabama*,[66] where the defendant was the only person with tattoos on his face, stating that "a reasonable effort to harmonize the lineup is normally all that is required."[67]  The Government also notes that the lineup was prepared by a disinterested law enforcement agency, the Louisiana State Police, which further supports the conclusion that "nothing about this lineup or any actions by parties associated with the identification procedure [] create[d] unfair or substantial prejudice."[68]

Next, the Government contends that "mere speculation" that Bank Teller A might have seen Saunders' picture in the news before identifying him in the photographic array does not establish that the procedure was impermissibly suggestive.[69]  The Government notes that Bank Teller A stated at the time of the identification and on direct and cross-examination during the suppression hearing that she did not see any local media prior to viewing the photographic lineup.[70]  Even if Bank Teller A had seen Saunders' photograph in the news, the Government states that "courts in the Fifth Circuit have upheld identifications in *United States v. Sharpe*, and *U.S. v. Lang*,  cases in which witnesses saw defendants' photographs in the news prior to being shown photographic arrays," because the witnesses' encounters with the photographs were "unplanned and unexpected."[71]  The Government further argues that even if Bank Teller A "had seen Saunders' photograph on television or online and that the Fifth Circuit jurisprudence cited above did not exist, there is still no allegation of unconstitutional action on the part

---

[66] 577 F.2d 1322, 1327 (5th Cir. 1978).

[67] Rec. Doc. 95 at p. 12 (quoting *Swicegood*, 577 F.2d at 1327).

[68] *Id.*

[69] *Id.* at p. 9 (*United States v. Burbridge*, 252 F.3d 775, 780 (5th Cir. 2001)).

[70] *Id.* at p. 10.

[71] *Id.* at pp. 9-10 (citing *United States v. Sharpe*, 193 F.3d 852, 868 (5th Cir. 1999); *United States v. Lang*, No. 06-30124, 2007 WL 1725548, at **9-10 (5th Cir. June 14, 2007)(internal citations omitted)).

of any governmental actor or entity or any suggestiveness with regard to the photo lineup in this case."[72]

Finally, the Government avers that, even if the Court determines that the identification procedure was impermissibly suggestive, the factors the Court should consider with regard to suppression weigh in favor of admitting the identification based on Bank Teller A's testimony and the video surveillance presented at the hearing, because there is not a substantial likelihood of misidentification in this case. Specifically, the Government notes that Bank Teller A testified that "Saunders' face was uncovered and he was only approximately three feet away from her," suggesting that she had the opportunity to view the assailant at the time of the crime.[73] The Government states that Bank Teller A was attentive because, while she was trying to figure out what was happening, she "looked directly at Saunders and was not distracted by a weapon."[74] Additionally, the Government states that "the witness's description of Saunders was accurate and detailed" on the day of the robbery, and that Bank Teller A "testified that she was 'very sure' of her identification."[75] Finally, the Government argues that the passage of two months between the crime and the identification does not establish a substantial likelihood of misidentification, because, in *United States v. Rice*,[76] the Fifth Circuit upheld a voice identification after the passage of eight months where the witness had "specific and vivid recollections."[77]

---

[72] *Id.* at p. 10.

[73] *Id.* at p. 13.

[74] *Id.*

[75] *Id.* (quoting Transcript, Rec. Doc. 93 at p. 81).

[76] 607 F.3d 133 (5th Cir. 2010).

[77] Rec. Doc. 95 at p. 14 (quoting *Rice*, 607 F.3d at 143).

The Government also disputes Saunders' contention that the Court should consider the fact that Bank Teller A's co-worker did not make a positive identification of Defendant. The Government avers that Saunders provides "no citation in support of his claim" and the Government "has found no case supporting [Saunders'] argument," and therefore "[w]hether or not another victim was able to identify Saunders has no bearing on whether the identification was unnecessarily suggestive or unreliable.[78]

## III.  Law and Analysis

### A.  Applicable Law

The Supreme Court has recognized that the Due Process Clause of the Fifth Amendment guarantees a defendant's right to exclude, as unreliable, identification testimony that results from improper employment of photographs by police.[79]  In a series of decisions spanning over four decades, the Court explains the approach appropriately used to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by improper police arrangement.[80]

"The due process check for reliability, *Brathwaite* made plain, comes into play only after the defendant establishes improper police conduct."[81]  *Brathwaite*'s key premise is that "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to

---

[78] *Id.* at p. 12.

[79] *See Perry*, 132 S.Ct. at 725-26; *Simmons v. United States*, 390 U.S. 377, 383-84 (1968) .

[80] *See Perry*, 132 S.Ct. 716 (holding that improper police conduct must be shown before a court will screen eyewitness identification evidence for reliability); *Manson v. Brathwaite*,  432 U.S. 98 (1977) (setting forth approach for screening eyewitness identification evidence for reliability if unnecessarily suggestive); *Neil v. Biggers*, 409 U.S. 188 (1972) (providing factors courts consider, under the totality of the circumstances, to determine if eyewitness identification evidence is unreliable); *Simmons*, 390 U.S. 377 (holding that photographic identification evidence should only be suppressed if the procedure was so suggestive as to give rise to a very substantial likelihood of irreparable identification); *Stovall v. Denno*, 388 U.S. 293 (1967) (holding that a suggestive but necessary showup is not a violation of defendant's due process).

[81] *Perry*, 132 S.Ct. at 726.

deter law enforcement use of improper lineups, showups, and photo arrays in the first place."[82]  The

Supreme Court  has held that "due process concerns arise only when law enforcement officers use an

identification procedure that is both suggestive and unnecessary."[83]  Moreover, even when the police

use such a procedure, "suppression of the resulting identification is not the inevitable consequence."[84]

Instead, courts must assess, "on a case-by-case basis, whether improper police conduct created a

'substantial likelihood of misidentification,'"[85] and the "[r]eliability of the eyewitness identification is

the linchpin of that evaluation."[86]

Courts are instructed to consider whether, under the totality of the circumstances, the

suggestiveness led to a substantial likelihood of irreparable misidentification based upon: (1) the

witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention

at the time of the crime; (3) the accuracy of the witness's prior description of the criminal; (4) the

witness's level of certainty when identifying the defendant at the confrontation; and (5) the length of

time elapsed between the crime and the confrontation.[87] Thus, if after evaluating the reliability of the

identification based upon the "totality of the circumstances,"[88] the "'indicators of a witness'[s] ability

to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement

---

[82] *Id.* (citing *Brathwaite*, 432 U.S. at 114).

[83] *Id.* at 724 (citing *Brathwaite*, 432 U.S. at 107; *Biggers*, 409 U.S. at 198).

[84] *Id.* (citing *Brathwaite*, 432 U.S. at 112-13; *Biggers*, 409 U.S. at 198-99).

[85] *Id.* (quoting *Biggers*, 409 U.S. at 201).

[86] *Id.* (quoting *Brathwaite*, 432 U.S. at 114).

[87] *Biggers*, 409 U.S. at 199-200; *see also Burbridge*, 252 F.3d at 780; *United States v. Honer*, 225 F.3d 549, 553 (5th Cir. 2000).

[88] *Brathwaite*, 432 U.S. at 110.

suggestion, the identification should be suppressed."[89]

The party seeking the suppression of the identification evidence bears the burden of production and persuasion in a suppression hearing to establish that both prongs of the two-step analysis are met.[90] The question of whether identification evidence and the fruits of the identification are admissible at trial is a mixed question of law and fact.[91]  Although such mixed questions are subject to *de novo* review, a district court's factual findings are reviewed for clear error.[92]  Specifically, the Fifth Circuit "give[s] credence to the credibility choices and findings of fact of the district court unless clearly erroneous."[93]

### B. Analysis

#### 1. Whether the Identification Was Impermissibly Suggestive Due to Improper Police Conduct

As noted above, to succeed on an eyewitness identification suppression motion, a defendant must first prove that the identification procedure employed by law enforcement officers was impermissibly suggestive.[94]  Central to this initial inquiry is whether the identification procedure was impermissibly suggestive and whether the suggestive circumstances are attributable to the procedures employed by the police, because, as *Perry* makes clear, the due process check for reliability of the

---

[89] *Perry*, 132 S.Ct. at 725 (quoting *Brathwaite*, 432 U.S. at 114).

[90] *See United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).

[91] *Fletcher*, 121 F.3d at 194 (citing *United States v. Sanchez*, 988 F.3d 1384, 1389 (5th Cir. 1993)).

[92] *Id.* (citing *Buser by Buser v. Corpus Christi Indep. Sch.*, 51 F.3d 490, 492 (5th Cir. 1995); *United States v. Diecidue*, 603 F.2d 535, 565 (5th Cir. 1979)).

[93] *United States v. Shaw*, 894 F.2d 689, 691 (5th 1990).

[94] *Biggers*, 409 U.S. at 198 (citing *Simmons*, 390 U.S. at 384).

eyewitness identification evidence is unwarranted "without the taint of improper state conduct."[95]

Recently, in *Perry*, the Supreme Court reiterated the rationale of deterring improper police conduct underlying its decisions regarding the admissibility of eyewitness identifications under the Due Process Clause.[96] The Supreme Court emphasized, as it had in *Brathwaite*, that the defendant must first establish that improper police conduct created the suggestive identification procedure, before a court will evaluate the reliability of such identification.[97] In *Perry*, the witness identified the defendant in what amounted to a one-person showup when the witness, in response to the officer's request for a more specific description, pointed out of her kitchen window and identified the defendant who was standing next to a police officer.[98] The Supreme Court rejected the defendant's contention that trial judges should be required to "prescreen eyewitness evidence for reliability any time an identification is made under suggestive circumstances," because "law enforcement officials did not arrange the suggestive circumstances surrounding the defendant's identification" in that case, and the "due process check for reliability . . . comes into play only after the defendant establishes improper police conduct."[99] The Supreme Court reasoned that although the identification was conducted under suggestive circumstances, the police did not engage in any improper behavior, and therefore the deterrence rationale was inapposite.[100] The Supreme Court refused to extend its earlier holdings in *Stovall*, *Brathwaite* and *Biggers* to require "a preliminary judicial inquiry into the reliability of an

---

[95] 132 S.Ct. at 728.

[96] *Id.* at 726.

[97] *Id.*

[98] *Id.* at 722.

[99] *Id.* at 725-26.

[100] *Id.* at 726.

eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement."[101]

Here, Defendant alleges that the procedure employed by the JPSO, where they issued a press release just prior to showing the witness the defendant's photograph in a lineup, was improper and suggestive, and that the unnecessarily suggestive identification is unreliable, all in violation of the Due Process Clause of the Fifth Amendment.   The  Court finds that the Supreme Court's deterrence rationale is applicable to the police conduct involved here, where the police: (1) participated in creating the photographic lineup; (2) released the photograph of the suspected robber to the press the day before a photographic lineup was to be presented to the witness; (3) contacted Bank Teller A,  after having little or no contact with the witness regarding the investigation between the date of the robbery and Defendant's arrest, and instructed her not to look at the news because she would be participating in a photographic lineup the next day; and (4) took an unsworn audio recorded statement from Bank Teller A *after* Sgt. Renaudin presented the photographic array to Bank Teller A and secured a positive identification of Saunders.

Although the Government asserts that the fact that Det. Rumore advised Bank Teller A not to look at the news before the lineup, and that Bank Teller A testified that she did not look at the news, eliminates the improper police conduct here, the Court disagrees.  In fact, contacting the witness and instructing her not to look at the news did not eliminate, and may have exacerbated the prejudice, by alerting Bank Teller A to the publication of the article and photograph.  As Saunders points out, what is the purpose of releasing the defendant's photograph in a press release regarding his arrest for the robbery before showing the lineup to the witness?  The Government puts forth no evidence of

---

[101] *Id.* at 730.

necessity, as there was none.  Saunders was in custody.  Thus, the Court is disturbed by the unnecessarily suggestive identification procedure employed by the JPSO.  Further, the Court finds it improper and that it created a risk of misidentification.

In *United States v. Henderson*,[102] the Fifth Circuit recognized that police conduct similar to that at issue here was "suggestive," although the court ultimately concluded that the district judge did not err in admitting the identification evidence.  Specifically, the Fifth Circuit stated: "To be sure, there were at least two facts indicating either that the procedures followed were 'suggestive,' or that they 'created a risk of misidentification': the fact that [one witness] was told that the police had suspects before she examined the photographs on June 19, and the fact both witnesses saw newspaper pictures identifying the two men as the men suspected of the robbery before the preliminary hearing."[103] Recognizing that the Fifth Circuit indicated that the district court's decision could have correctly gone either way, this Court nevertheless finds that *Henderson* is distinguishable from this case, because there, unlike this case, the initial identification occurred *before* publication of the newspaper photographs.

Here, if Bank Teller A had in fact seen Saunders' photograph in the NOLA.com article prior to making her identification of Saunders' photograph in the array, *Henderson* suggests that the identification would be impermissibly suggestive.  Further, it is well-established that "exhibiting a single photograph for identification purposes is impermissibly suggestive."[104] Although the police did not show Bank Teller A the picture in the paper, Det. Rumore–knowing that Saunders' photograph would be in the news because the JPSO had released it–contacted Bank Teller A, after two months of

---

[102] 489 F.2d 802 (5th Cir. 1973).

[103] *Id.* at 804.

[104] *Sanchez*, 988 F.2d at 1389 (citing *Brathwaite*, 432 U.S. at 108-109).

having little or no contact with her, and asked her to participate in a photographic lineup the next day and to avoid the news. Under these circumstances, Bank Teller A could infer that the police had a suspect and that the suspect would be identified in the news.

The Government would have the Court believe that whether this identification was impermissibly suggestive depends on whether Bank Teller A did in fact look at the news. However, it is the police procedure used here that is at issue in the Court's determination of whether the identification procedure was both suggestive and unnecessary. The fact that the JPSO told Bank Teller A not to look at the news does not cure the unnecessarily suggestive identification procedure employed by the police. In fact, calling the witness's attention to the news article which identified the suspect in custody, only exacerbated the suggestiveness of the procedure. Moreover, having heard the testimony of Bank Teller A, including the discrepancies in her testimony regarding whether she looked at the internet at all prior to making her identification, and the lack of explanation provided by Bank Teller A or Det. Rumore as to why the identification was not conducted earlier, the Court is not persuaded that the identification procedure employed by the JPSO regarding Bank Teller A was not affected in some way by the NOLA.com article. In fact, from the tone and tenor of her testimony, it appeared that Bank Teller A knew that the suspect would be in the news in some way, and even perhaps that he was in custody.[105]

The Court is not persuaded by the Government's reliance on *Sharpe* for the proposition that the identifications should be admitted even where the witness saw the defendant's photograph in the newspaper, because it finds *Sharpe* to be distinguishable from the situation here. In *Sharpe*, the witness's mother gave him a newspaper article containing a photograph of the defendant, and the

---

[105] *See* Transcript, Rec. Doc. 93 at p. 94.

witness advised the government that the photograph of the defendant in the newspaper was the same person he saw on the night of the crime.[106] This case is distinguishable from *Sharpe* because, here, the police issued a press release announcing Saunders' arrest and attaching his photograph, and then contacted Bank Teller A to inform her not to look at the news because the police would be conducting a photographic lineup with her the next day. Moreover, the Fifth Circuit has distinguished *Sharpe* from cases involving photographic lineups prepared by police, stating: "In contrast, [the witness's] encounter with [the defendant's] photograph [in *Sharpe*] was unplanned and unexpected, and thus did not give rise to a due process challenge."[107]

The Court finds the Government's reliance on *Sharpe* unpersuasive, because any influence the photograph in the news may have had on Bank Teller A's identification of Saunders was not unplanned or unexpected. Here, Det. Rumore testified that he told Bank Teller A about the article because he knew if she saw it, it would be prejudicial to the identification. Further, the police assisted in the preparation of the photographic array, released Defendant's photograph to the press prior to conducting the identification, and gave Bank Teller A instructions from which she likely could infer that the police had a suspect and he would be identified in the news. Additionally, no adequate explanation has been provided by the Government as to why the police did not conduct the lineup prior to the photograph's release, or what was the purpose for issuing a press release announcing Saunders' arrest prior to conducting the lineup. Saunders was in custody, and so if he was the robber, he posed no danger, and withholding the press release until the lineup was completed would have better ensured the reliability of the photographic identification. According to Det. Rumore's testimony, the police knew of the prejudice that could arise, but did nothing to stop it. And for these additional reasons, and considering

---

[106] *Sharpe*, 193 F.3d at 868.

[107] *Id.*

the testimony of Bank Teller A, Det. Rumore, and Sgt. Renaudin, the Court finds that Defendant has carried his burdens of production and persuasion to establish that the identification procedure employed by the JPSO, of issuing a press release of Defendant's arrest along with his photograph, prior to conducting the photographic lineup with the witness, was impermissibly suggestive. Instructing the witness not to look at the news prior to viewing the lineup did not cure the impermissibly suggestive procedure used by the JPSO in conducting the lineup.

In attacking the improper procedures employed by the police, Saunders has also attacked the photographic array prepared by the police as impermissibly suggestive, because Saunders' photograph was in the center of the photographic lineup, was one of only two photographs of men wearing white shirts, and was the only photograph of a man in a white shirt with a "thick mustache" or "shadows" on his face.[108] Considering the case law, the Court finds this argument has merit.

In *United States v. Saunders*,[109] the United States Court of Appeals for the Fourth Circuit found a photographic array to be impermissibly suggestive because the "photo stood out sharply from the others in the array. The dark background and lack of overhead lighting in [the defendant's] photo distinguished it from the remaining five photos, all of which had light backgrounds and overhead lighting."[110] The Fourth Circuit elaborated that the difference in lighting yielded "potentially problematic consequences" because "[t]he dark background and lack of lighting . . gave [the defendant] a menacing countenance that was lacking in the men in the other five photos."[111] Further, the Fourth Circuit stated that "[t]he suggestive nature of the photo array was exacerbated here by the failure of

---

[108] Rec. Doc. 94 at p. 3 (citing Transcript, Rec. Doc. 93 at pp. 31-32, 66-67).

[109] 501 F.3d 384 (4th Cir. 2007).

[110] *Id.* at 390.

[111] *Id.*

the police to take precautions that would have reduced the risk of a tainted identification," because the police informed the witness that "they had arrested one or more suspects in the robbery," which may have lead the witness "to assume that a photo of the arrested person will be in the array . . . and feel pressure to make an identification, even if he is not fully confident, for fear of jeopardizing the case against the arrested suspect."[112]

Similarly, in *United States v. Wiseman*,[113] the United States Court of Appeals for the Tenth Circuit held that the photo array was unduly suggestive because "[t]he photo used in the array shows defendant with very prominent dark circles under his eyes and with an extremely unnatural, chalk-white pallor, while the skin tones in the photos of the other five persons in the array look quite natural."[114] The Tenth Circuit further stated that "[t]he suggestive effect created by the sharp contrast between the appearance of defendant's picture and those of the others in the array is not diluted in this case by the use of a substantial number of photos. Instead, . . . using as few as six photos in an array, while not *per se* a due process violation, is a factor affecting the weight we give to the irregularities in the array."[115] Although *Saunders* and *Wiseman* are merely persuasive authority, they demonstrate how improper police procedures, such as the preparation and use of a photographic array that is suggestive, can create a situation where the identification procedure used by the police was impermissibly suggestive under the Due Process Clause of the Fifth Amendment. Here, Saunders' photograph was in the center of a photographic array consisting of only six individuals, and Saunders' photograph was one of only two photographs of men wearing white shirts–attire suggestive of the

---

[112] *Id.* at 391.

[113] 172 F.3d 1196 (10th Cir. 1999)

[114] *Id.* at 1209.

[115] *Id.*

white T-shirts associated with criminal activity and which attracts the eye because it stands out. Further, Saunders photograph was the only one of a man in a white shirt with a "thick mustache" or "shadows" on his face,[116] which could correlate with the acne pores described in Bank Teller A's initial description of Robber 1.  Moreover, Bank Teller A had little or no communication with law enforcement officers investigating the robbery, other than an officer coming to the bank to look at the scene, until she was contacted on January 12, 2013 regarding the lineup.  Under such circumstances, Bank Teller A could infer that the police had a suspect when she was contacted about the lineup and could have felt pressure to make an identification.  Further, the Court has limited information about Bank Teller A's initial reaction to the photographic array, because as Sgt. Renaudin testified, he did not record the identification, which he stated is in conformity with the JPSO's policy, but rather took a recorded statement only after Bank Teller A had correctly identified the defendant.  Therefore, the Court finds, and the facts presented in the hearing on this matter and accompanying briefs support the conclusion, that the photographic identification procedure employed by the police in preparing the photographic array was also suggestive.

Although the Court is not convinced that the photographic array alone rises to the level of *impermissibly suggestive*, because Defendant's photograph was not the only one in a white shirt and the shadows of his acne pores could be compared to the tattoos on the face of the defendant in *Swicegood*, when the photographic lineup is considered in conjunction with the JPSO's procedure in issuing a press release announcing the defendant's arrest with a photograph before a photographic lineup was conducted, the Court finds the procedure impermissibly suggestive and unnecessary. Having determined that the police procedures used in this case were unnecessary and impermissibly

---

[116] Rec. Doc. 94 at p. 3 (citing Transcript, Rec. Doc. 93 at pp. 31-32, 66-67).

suggestive, the Court must now determine whether a substantial likelihood of irreparable misidentification exists, such that the identification is unreliable and must be suppressed.

   *2. Whether, Under the Totality of the Circumstances, the Suggestiveness of the Improper Police Conduct Lead to a Substantial Likelihood of Irreparable Misidentification, Such that the Identification is Unreliable*

   Rather than creating a "*per se* rule requiring exclusion of identification evidence" whenever the police use an unnecessarily suggestive identification procedure, the Supreme Court adopted a judicial screen for reliability to avoid depriving the jury of reliable identification evidence, "notwithstanding improper police conduct."[117]    To evaluate whether, under the totality of the circumstances, the suggestiveness of the identification procedure led to a substantial likelihood of irreparable misidentification by Bank Teller A, the Court must consider the following factors: (1) the witness's opportunity to view the defendant at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's description of the defendant prior to the identification; (4) the witness's level of certainty when identifying the defendant at the confrontation; and (5) the length of time elapsed between the crime and the confrontation.[118]

   In applying the first factor, the Court notes that Bank Teller A's opportunity to view Robber 1 at the time of the crime was "through the window [for] the one or two seconds" it took her to let Robber 1 into the bank.[119]   The Court also notes that Bank Teller B, who was also presented a photographic array containing Saunders' photograph, did not make any identification, despite the fact

---

[117] *Perry*, 132 S.Ct. at 726 (citing *Brathwaite*, 432 U.S. at 112-113).

[118] *Biggers*, 409 U.S. at 199-200.

[119] Transcript, Rec. Doc. 93 at p. 91.

that she had considerably more time to view Robber 1 during the robbery. Although the Government argues that Bank Teller B's failure to make any identification is irrelevant, the Court disagrees considering that the reliability of identification evidence must be evaluated under the "totality of the circumstances."[120] The Court also notes that although there is video footage taken at the bank during the robbery, and even though Robber 1's face was not covered, the film is too dark and grainy to make an identification, and so, even though Bank Teller A testified that she saw the video immediately after the crime, she admits she could not identify the robber from the video because the video does not provide a view of Robber 1's face with any clarity. Nevertheless, Bank Teller A testified that "Saunders' face was uncovered and he was only approximately three feet away from her," suggesting that she had the opportunity to view Defendant at the time of the crime.[121] Although, Bank Teller A's opportunity to view Robber 1 was limited to two seconds or less in duration and obscured by a small window enforced with chicken wire, the witness was firm in her testimony that Saunders was, in fact, Robber 1. Therefore, the first factor weighs in favor of finding the identification reliable. Concerning the second factor, Bank Teller A did not comment on her degree of attentiveness at the time of the crime in her testimony. However, she states that she saw Robber 1's face for one or two seconds, and, as noted by the Government, while she was trying to figure out what was happening, "[s]he looked directly at Saunders and was not distracted by a weapon."[122] Under such circumstances, it appears that all of her attention was focused on the face of Robber 1, and again, she remains firm about her identification. Thus, the second factor also weighs in favor of the reliability of the identification.

The third factor, the accuracy of the witness's description, does not weigh in favor of admitting

---

[120] *See Brathwaite*, 432 U.S. at 110; *Sanchez*, 988 F.2d at 1389.

[121] Rec. Doc. 95 at p. 13 (citing Transcript, Rec. Doc. 93 at p. 73).

[122] Rec. Doc. 95 at p. 13.

or suppressing the evidence. Bank Teller A's description was accurate when compared with the photograph she identified in the lineup. On the other hand, the description that Bank Teller A provided in her initial statement to the police was limited to race, a very approximate description of age, height, and weight, and that Robber 1 had acne scars on his face. This description is not particularly detailed, and certainly does not rise to the level of the "specific and vivid recollections" the Fifth Circuit relied on in *Rice* to uphold the admissibility of a voice identification made eight months after the incident.[123] Unlike this case, the evidence before the court in *Rice* indicated that the witness was "paying close attention to the perpetrator's voice during the crime . . . and she was able to describe in detail his distinctive way of speaking."[124] Here, Bank Teller A's description of Robber 1 was ostensibly accurate, but general, and provides little insight into the likelihood of misidentification here.

The testimony of Bank Teller A and Sgt. Renaudin supports the conclusion that Bank Teller A was "very sure" of her photographic identification. However, the fourth factor–the witness's level of certainty in making the identification–implicates the concern that Bank Teller A may have been influenced by knowing a suspect may have been in custody and that his description or image may have been in the news the day before she made her identification, the Court does not take lightly its consideration of this factor. Having heard the testimony of Bank Teller A and the law enforcement officers involved in this identification during the suppression hearing, the Court had the opportunity to weigh the credibility and consider the demeanor and non-verbal actions of the witnesses, the Court finds that the release of Defendant's photograph and knowledge of his arrest had some effect on the identification. However, the defendant has not carried his burden in demonstrating that any effect created by those circumstances rises to the level of irreparable misidentification by Bank Teller A.

---

[123] 607 F.2d at 143.

[124] *Id.*

Bank Teller A was firm and unwavering in her testimony that she did not see the NOLA.com article regarding Defendant's arrest along with his photograph. Being presented with no contradictory evidence by the defendant and no evidence undermining or putting into question the witness's veracity or credibility, her testimony under oath at the suppression hearing must stand.

Concerning the fifth factor, the two-month span of time between the identification and the robbery suggests that the identification may be unreliable, especially where the witness's opportunity to view Robber 1 was as short as one or two seconds. Additionally, the Court is concerned that, although the span of time between the crime and the identification is lengthy, the span of time between the publication of Saunders' photograph in the news and the identification was less than twenty-four hours. Further, the very law enforcement agency that released the photograph participated in the identification procedure.

The Court acknowledges, considering the applicable law, this case presents a factual scenario which could support suppression or admission of the identification. Further, when the Court considers the totality of the circumstances here, two other issues loom prominent. First, there is no evidence other than Bank Teller A's identification of Robber 1 to tie Saunders to the crime. Det. Rumore testified that there were no fingerprints of the robbers found at the scene of the crime or any other evidence linking Saunders to the crime. Also, there is no allegation that law enforcement's release of the photograph to the press prior to the identification was completely accidental. In fact, it was deliberate, because it was a press release, which is intentionally provided to the press for publication. And it certainly was avoidable and unnecessary, as there was no urgency in releasing Saunders' photograph to the press because he was already in custody. Here, the JPSO would have been justified in withholding the press release containing the defendant's photograph in order to protect the integrity of its ongoing investigation. In fact, under questioning during the suppression hearing, Det. Rumore

admitted the reason he told Bank Teller A not to look at the news was because he knew it would be prejudicial. However, despite all of the foregoing, Bank Teller A's testimony was firm–she was 95 to 100 percent sure–that Saunders was Robber 1. And, she testified under oath that she did not see the news article announcing the defendant's arrest, along with his photograph, prior to identifying him in the photographic lineup array.

The defendant has the burdens of production and persuasion in a suppression matter. Absent any evidence contrary to Bank Teller A's testimony or any evidence questioning her credibility or veracity, as is the case here, the Court finds that despite the fact that the procedure used by the JPSO was unnecessary and impermissibly suggestive, creating a risk of misidentification, considering the totality of the circumstances presented here, Bank Teller A's identification appears untainted by this procedure and reliable, and therefore admissible at trial.

### 3. Admissibility of In-Court Identification at Trial

Defendant also argues that Bank Teller A must be prohibited from making any identification of Saunders at trial, because such identification would be based entirely on her photographic identification. The Government has not argued that Bank Teller A's in-court identification of Defendant has any basis other than the pretrial identification made from the photographic array.

In *Allen v. Estelle*,[125] the Fifth Circuit explained that,

> [u]nder the totality approach[,] the admissibility of pretrial and in-court identification alike are governed by a single due process standard which accepts the reliability of the identification as the principal ingredient to be evaluated. Therefore, under the totality approach a determination that the challenged identification is reliable means that testimony as to it and any identification in its wake is admissible.[126]

---

[125] 568 F.2d 1108 (5th Cir. 1978).

[126] *Id.* at 1114.

Where, as here, the Court determines that although the police identification procedure used was unnecessary and impermissibly suggestive, the identification was nonetheless reliable, any subsequent in-court identification will be permitted, although the defendant will be allowed to present evidence regarding the circumstances of the identification for the jury to consider in weighing the testimony of Bank Teller A at trial.   Therefore, Bank Teller A will be permitted to make an in-court identification at trial, subject to cross-examination by Defendant.

## IV.  Conclusion

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Motion to Suppress Identification[127] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this   12th   day of June, 2013.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[127] Rec. Doc. 67.